**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq. (KR 4963)
Jeffrey D. Prol, Esq. (JP 7454)
Jeffrey A. Kramer, Esq. (JK 8278)
65 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 597-2500
Fax: (973) 597-2400

*Proposed Counsel to Debtors and*
*Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>MICROBILT CORPORATION, *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 11-18143 (MBK)<br><br>Joint Administration Requested |

**DECLARATION OF WALTER WOJCIECHOWSKI**
**IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS**

Walter Wojciechowski, pursuant to 28 U.S.C. § 1746, declares as follows:

1. I am the Chief Executive Officer and President of MicroBilt Corporation (the "**Debtor**" or "**MicroBilt**"). MicroBilt is the manager and sole member of CL Verify, LLC ("**CLV**" and collectively with MicroBilt, the "**Debtor**").

2. In accordance with the relevant resolutions and/or authorizations filed simultaneously with the Debtor's chapter 11 petition, I have been authorized to submit this Declaration in support of the applications and motions (collectively, the "**First Day Pleadings**")[2] which have been or will be filed with the Court in connection with the commencement of this

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: MicroBilt Corporation (7436) and CL Verify, LLC (7151).
[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the applicable First Day Pleading.

19039/5
03/24/2011 17042794.3

chapter 11 case and to assist the Court and other parties in interest in understanding the circumstances that precipitated the commencement of this chapter 11 case.

3. This Declaration is intended to explain the circumstances leading up to the Debtor's chapter 11 case, to provide general information about the Debtor and its business operations. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents or my opinion based upon my experience, knowledge and information concerning the Debtor's operations, financial condition and the industry as a whole. If I were called upon to testify, I would testify competently to the facts set forth herein.

4. In my capacity as CEO and President, I am responsible for the oversight of the Debtor's affairs and, as a consequence, I have detailed knowledge of all aspects of the Debtor's operations.

5. On March 18, 2011 (the "**Petition Date**"), MicroBilt filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code and, on March 23, 2011, CLV also filed a voluntary petition for relief under chapter 11 (collectively, the "**Chapter 11 Case**").

6. The Debtor continues to operate its business and manage its properties as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7. As of the filing of this Motion, no trustee, examiner or committee has been requested or appointed in this Chapter 11 Case.

I.  **The Debtor's Business Operations and Company History**

8. Debtor MicroBilt is a corporation duly organized under and existing pursuant to the laws of the State of Delaware, with principal offices located at 100 Canal Pointe Boulevard, Suite 208, Princeton, New Jersey 08540.

9. Debtor CLV is a limited liability company duly organized under and existing pursuant to the laws of the State of Florida, with principal offices located at 3030 North Rocky Point Drive, Suite 670, Tampa, Florida 33607. CLV is wholly-owned by MicroBilt.

10. As of the Petition Date, the Debtor employs 77 individuals in their offices located in Georgia, South Carolina, Florida, Texas, Washington and New Jersey.

11. The Debtor is a leader in risk management information for small and medium-sized businesses and a leading provider of alternative data for non-traditional lenders. MicroBilt provides online access to consumer and commercial credit bureau data with automated decisioning and collection services primarily to small and medium sized enterprises. Such enterprises use MicroBilt data and tools to facilitate credit originations, collect receivables, make lending decisions, screen employees, select tenants and manage business risk. The Debtor provides these services (a) directly to the business, (b) by private label and (c) by co-branded relationships. With its PRBC Consumer Report and being the exclusive provider of the FICO Expansion Score, the Debtor is the leading provider of alternative credit data to businesses that want to offer credit and financial services to the approximately 110 million underserved and underbanked individuals in the United States.

12. The Debtor is also a leader in proprietary comparative private-company financial information with its "Integra Data" on more than 4.5 million privately held companies collected from 32 governmental and non-governmental sources along with analytic tools. Integra users are lenders, CPA's, investment firms, valuation professionals and venture capitalists who use the data to value and benchmark the financial performance of non-public firms.

13. The MicroBilt business began in 1978 as Equipment Resources Incorporated, a provider of communications devices ("**Equipment Resources**"). In 1982, Equipment Resources introduced communications terminals into the credit industry. Equipment

Resources changed its name to MicroBilt in 1984 as it began to develop value added software programs for its communications devices in addition to its proprietary hardware platforms. MicroBilt went public in 1985, but was purchased by First Financial Management Corporation in 1990, which, in turn, was acquired by First Data Corporation ("**First Data**") in 1995. Under First Data's control, MicroBilt developed Windows-based desktop software solutions for customers as well as enterprise solutions for local area networks, wide area networks, credit communications engines and browser-based applications. These developments were focused on enhancing the leasing of its proprietary hardware platforms that allowed customers to communicate directly with the consumer and commercial credit bureaus.

14. In April 2000, First Data transferred its MicroBilt assets to MicroBilt, LLC and sold that entity to Bristol Investments, Ltd., a Princeton-based business incubator ("**Bristol**"), in June 2000. Bristol later merged MicroBilt, LLC into a new Delaware "C" corporation, MicroBilt Corporation. With Bristol as majority shareholder, the Debtor implemented a process to move the Debtor away from providing access to credit bureau data through the leasing of proprietary hardware to delivering all types of risk management information through an on-line, transactions-based platform. In September 2010, the Debtor company merged with an affiliate of CLV, formerly owned by DP Bureau, LLC, a leading supplier of credit related information to on-line payday loan companies.

15. The Debtor's non-debtor subsidiary, Pay Rent, Build Credit, Inc. ("**PBRC**") and CLV are wholly owned subsidiaries of the Debtor. These subsidiaries contain some legacy assets and liabilities from previous acquisitions. The majority of the operating assets and liabilities have been absorbed by the Debtor. Attached hereto as Exhibit A, is a more comprehensive list of the Debtor's subsidiary companies and divisions.

16. The Debtor and its subsidiaries on a combined basis recognized revenues for the period ended December 31, 2010 of $20,164,408.

## II. The Debtor's Prepetition Debt Structure

17. As of the Petition Date, the Debtor had no outstanding aggregate secured debt and outstanding aggregate unsecured debt totaling approximately $8,380,767.30.

### A. Trovado Inc.

18. The Debtor is indebted to Trovado, Inc. ("**Trovado**") pursuant to a promissory note dated August 31, 2010, in the original principal amount of $3,145,000.00. The note bears interest at a monthly amount of $30,000.00. As of the Petition Date, the aggregate principal amount, including interest owed to Trovado is approximately $3,433,473.00 and the Debtor was current on its obligations.

### B. DP Bureau

19. The Debtor is indebted to DP Bureau, LLC ("**DPB**"), the former owners of CLV, pursuant to an agreement between the parties on August 31, 2010, in the original principal amount of $555,000.00. There is no stated interest rate. Monthly payments were agreed to by the parties at a monthly minimum of $50,000.00 to a maximum of $125,000.00 based on the Debtor's cash flow. As of the Petition Date, the aggregate principal amount owed to DPB is approximately $330,000.00 and the Debtor was current on its obligations.

### C. Oscar Marquis

20. The Debtor is indebted to Oscar Marquis ("**Marquis**") pursuant to a demand note dated January 1, 2007, in the original principal amount of $200,000.00. The note bears interest at LIBOR plus 1 percent per annum. As of the Petition Date, the aggregate principal amount owed to Marquis is approximately $218,065.95 and the Debtor was current on its obligations.

    **D.    Ford Foundation**

21. In 2004, prior to the Debtor's merger with PRBC in December 2008 with same, received a recoverable grant of $250,000.00 in 2004 from the Ford Foundation ("**Ford Foundation**"). Under the terms of the grant, the Debtor deposits funds derived from the sale of consumer reports and services into an interest bearing escrow account due and payable to the Ford Foundation on the earlier of April 1, 2013 or when the sinking fund account equals $250,000.00. As of the Petition Date, the aggregate amount in the sinking fund account is $13,778.61.

    **E.    Other Unsecured Debt**

22. As of February 28, 2011, the Debtor had aggregate unsecured debt other than that set forth above approximately $4,099,228.4. This debt includes, but is not limited to, trade payables, accrued wages and unpaid leave, garnishments and payroll liabilities, and corporate, state, local, sales and use tax liabilities, and will be set forth more fully in the Debtor's statement of financial affairs and schedules.

    **F.    Shareholder Equity**

23. On December 31, 2010 and as of the Petition Date, the Debtor had approximately 18 shareholders of record and 124,590,023 shares of common stock were outstanding (the "Common Stock"). Additionally, options and warrants for 27,403,895 shares of Common Stock had been granted or were available to grant. In the aggregate, a total of 151,993,918 shares of Common Stock have been issued, subscribed and reserved.

**III.    Events Leading to Chapter 11**

24. As discussed above, the Debtor is in the business of providing consumer-specific information and service offerings consisting of closure and inquiry files related to consumer transaction accounts with financial institutions, records of returned checks reported by retail merchants, and consumer identity data to lenders such as credit unions and car dealerships,

among others, which the lenders use to make decisions about lending money to their customers. In this industry, MicroBilt is often referred to as a "reseller" as it obtains information from third parties for sale to its customers, referred to as "end users."

25. The Debtor's bankruptcy filing stems from a dispute with one of its Information suppliers, Fidelity National Information Services, Inc., d/b/a Chex Systems, Inc. ("**Chex**"). MicroBilt and Chex had a long-standing contractual relationship whereby Chex would sell information (the "**Information**") to MicroBilt. MicroBilt would resell the Information to end users who included lenders such as credit unions and auto dealerships. MicroBilt would also resell the Information through sales agents to their end users.

26. A dispute arose under that long-standing contractual relationship which resulted in litigation after Chex unilaterally terminated its contract with MicroBilt effective October 8, 2008. The termination left MicroBilt without the ability to buy and resell Chex' Information for a period of eleven months. During that time, MicroBilt lost $2.0 million in revenue and the company value decreased by $12 million. That problem was resolved only after MicroBilt brought a lawsuit against Chex and the parties resolved the matter through arbitration before Judge John Hughes (retired) and entering into a Memorandum of Understanding (the "**MOU**") on June 18, 2009, which led to a definitive Resale Agreement between the parties dated August 26, 2009, as amended in January of 2010 (the "**Amended Resale Agreement**").

27. Through a series of corporate transactions, including a merger, CLV became a wholly owned subsidiary of MicroBilt. CLV was also a reseller of information that it purchased from Chex. Because MicroBilt's contract with Chex provided more favorable terms to the Debtor, CLV and MicroBilt notified Chex of their intent to merge prior to the transaction and to use the more favorable terms in MicroBilt's contract. CLV terminated the Chex contract after the merger and the termination was accepted by Chex.

28. Thereafter, Chex sued CLV and DP Bureau in the United States District Court for the Middle District of Florida (the "**Florida Federal Court**") for breach of contract and failure to pay outstanding invoices. CLV brought a counterclaim for a violation of Florida's Uniform Trade Secret Act because Chex attached invoices containing confidential and proprietary information, including customer names and price and transaction volume of reports to its complaint.

29. Additionally, after the merger, Chex decided that it was more profitable for Chex to wrongfully terminate the Amended Resale Agreement and suffer the minimal consequences of MicroBilt's limited damage remedy, than it was for Chex to perform in good faith under the Amended Resale Agreement. Accordingly, Chex began creating illegitimate reasons for claiming that MicroBilt failed certain end user audits, unilaterally increased its pricing despite having no contractual basis to do so, and refused to provide MicroBilt with "sub codes"[3] for fifty of its end users (the former CLV customers).

30. As a result of such actions, MicroBilt sought a temporary restraining order on November 29, 2010, in the Superior Court of New Jersey, Mercer County. Chex removed the matter to United States District Court for the District of New Jersey (the "New Jersey Federal Court"). In the New Jersey Federal Court, MicroBilt's request for a temporary restraining order was denied and the matter was transferred *sua sponte* to the Florida Federal Court.

31. On November 29, 2010, MicroBilt also filed a demand for arbitration with the Honorable John J. Hughes (now retired), pursuant to the terms of the MOU and the Amended Resale Agreement. Chex contested the Arbitration Demand and refused to arbitrate before Judge Hughes.

---

[3] When MicroBilt wants to provide Information to a new end user, either directly or through a sales agent, MicroBilt initiates a request for a sub code for that end user by sending an email to Chex. Under the Amended Resale Agreement, the only information that MicroBilt is required to provide to Chex is the full known business name of the end user. In turn, Chex issues a sub code to MicroBilt for that end user. The end user is then able to access the Information on computers at its place of business.

32. The Debtor's position is that, pursuant to the MOU, the Amended Resale Agreement and a later executed Settlement Agreement and Release of November 9, 2009, the Debtor and Chex are required to arbitrate this dispute before Judge Hughes.

33. On February 18, 2011, Chex sent a letter to Paul Maselli, Esquire, counsel for MicroBilt, advising that it intended to terminate the Amended Resale Agreement in thirty (30) days. Another letter dated February 23, 2011, alleged that MicroBilt has failed to pay all Chex invoices in full. Pursuant to the Amended Resale Agreement at paragraph 26, all termination notices are to be made in writing and sent directly to MicroBilt's offices in Georgia and New Jersey. Chex' letters were not received by MicroBilt until March 21, 2011, after the Petition Date. Moreover, the letters did not purport to terminate the Amended Resale Agreement, but only indicated a future intent to do so.

34. The termination letters allege that MicroBilt has breached the Amended Resale Agreement by: (1) failure to pay invoices in full; (2) failure to properly credential end users; (3) failure to comply with the audit process; and (4) failure to share information with Chex. All of these allegations are disputed by MicroBilt.

35. On March 11, 2011, MicroBilt filed for emergency relief with the AAA in accordance with paragraph 29 of the Amended Resale Agreement. Chex refused consent to have the matter heard on an emergency basis. The AAA application has since been withdrawn by MicroBilt.

36. On March 18, 2011, Chex informed the Debtor that it would discontinue service to the Debtor at midnight on Sunday, March 20, 2011, if the Debtor failed to pay Chex monies which the Debtor disputed were owed. As a result, the Debtor commenced this chapter 11 case in an effort to reorganize and preserve its business for the benefit of all creditors and other stakeholders.

37. Prior to the Petition Date, Chex was clearly trying to terminate the Amended Resale Agreement for any reason because Chex determined that it was no longer profitable for Chex to perform under the contract. After months of consistent billing from February through August 2010 in accordance with the pricing terms of the Amended Resale Agreement, commencing with the invoices of October 19, 2010, Chex has unilaterally increased the price it charges MicroBilt for the sale of Information, charging prices that have no basis in the Amended Resale Agreement. This unilateral price increase sought to increase the price to MicroBilt both retroactive to the February through August 2010 invoices which had already been paid by MicroBilt, as well as the September 2010 invoice and those going forward. Chex has also asserted that MicroBilt has failed in several end user audits on grounds that have nothing to do with credentialing and compliance with the Fair Credit Reporting Act ("**FCRA**"). Chex has shown its willingness to aggressively violate MicroBilt's right to confidentiality of its customer list by forwarding to MicroBilt's competitors, specific details of MicroBilt's end user customers under the guise of "sales leads" and encouraging those competitors to try to steal those end users from MicroBilt.

38. The Debtor is contractually entitled to resell Chex' Information to the end users of CLV that existed on the date of the Merger and is in compliance with the requirements of the FCRA. The Debtor is not in breach of the Amended Resale Agreement.

39. If Chex should now terminate the Amended Resale Agreement, the effect on the Debtor will be devastating. The Debtor, in reliance on its rights to purchase Information from Chex for the next nine years under the pricing terms set forth in the Amended Resale Agreement, has substantially increased its need for Information from Chex for resale. MicroBilt merged with CLV and thereby acquired 250 end users to whom MicroBilt will resell Chex' Information. The Debtor also entered a contract with Fair Isaac Corporation ("**FICO**") making MicroBilt the exclusive operator of FICO's "FICO Expansion Score" division in exchange for a substantial financial and operational commitment by MicroBilt. The FICO contract requires the

Debtor to deliver a substantial volume of Chex' Information. The Debtor has also signed up a substantial number of new end users to whom it resells Chex' Information. If the Amended Resale Agreement is terminated, the Debtor will lose a substantial customer base because the customers to whom it resells Information comprise 58% of its business (a business valued at between $150-180 million); and there is no replacement vendor from whom the Debtor can feasibly purchase the same Information it purchases from Chex.

## IV. First Day Pleadings

40. In order to facilitate its orderly transition into chapter 11, the Debtor has filed the following first day motions (the "First Day Motions") contemporaneously herewith and has requested that the Court consider them on an expedited basis:

(a) Motion for Entry of an Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 1015(b) Directing Joint Administration of the Debtors' Chapter 11 Cases

(b) Motion Pursuant to Fed. R. Bankr. P. 1007(c) for An Order Granting The Debtor An Extension Of Time to File Schedules and Statement Of Financial Affairs;

(c) Motion for an Order Pursuant to Section 521 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 1007(a) (I) Granting the Debtor an Extension of Time to File its List of Creditors and (II) Authorizing Debtor to Mail and Serve Initial Notices;

(d) Motion for An Order Pursuant to 11 U.S.C. §§ 105(a), 363(c), 345(b), 1107 and 1108 (i) Authorizing the Debtor to Continue and Maintain its Existing Cash Management System, Bank Accounts and Business Forms, (ii) Modifying The Investment Guidelines Set Forth in 11 U.S.C. § 345, and (iii) Granting Related Relief;

(e) Motion for Entry of an Interim Order and a Final Order (i) Prohibiting Utility Companies From Discontinuing, Altering or Refusing Service on Account of Prepetition Invoices, (ii) Deeming Utility Companies to Have Adequate Assurance of Future Payment, and (iii) Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105(A) and 366

(f) Motion for An Order Pursuant to 11 U.S.C. §§ 105(a), 363(b) and 507(a) (i) Authorizing The Debtor to Pay Prepetition Wages and Salaries and

>    Related Obligations and Taxes and (ii) Directing All Banks to Honor Checks and Transfers for Payment Of Prepetition Employee Obligations.

41. For a more detailed description of these motions, the Debtor and I respectfully refer the Court to the First Day Motions. To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motion shall control.

42. As a result of my first-hand experience, and through my review of various materials and information, discussions with the Debtor's representatives, and discussions with the Debtor's outside advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by the Debtor in the First Day Motions, (b) the need for the Debtor to transition into chapter 11 smoothly, and (c) the deleterious effects upon the Debtor of not obtaining such relief.

43. As described more fully in the First Day Motions, the relief requested in the First Day Pleadings was carefully tailored by the Debtor, in consultation with their professionals, to ensure that the Debtor's immediate operational needs are met and that the Debtor suffers no immediate and irreparable harm. I personally participated in the analysis that lead to the creation of each of the First Day Pleadings and assisted in the drafting and development of the relief requested therein. At all times, the Debtor's management and professionals remained cognizant of the limitations imposed on debtors in possession, and in light of those limitations, the Debtor narrowed the relief requested at the outset of these cases to those issues that require urgent relief to sustain the Debtor's operability, pending confirmation of a plan of reorganization pursuant to chapter 11 of the Bankruptcy Code.

44. I have reviewed each of the First Day Motions (including the exhibits attached thereto) and, to the best of my knowledge and belief, the facts set forth therein are true and correct. Such representation is based upon my review of various materials and information, as well as my experience and knowledge of the Debtor's operations and financial condition. If I

were called upon to testify, I could and would testify competently to the facts set forth in each of the First Day Motions.

45. The relief sought in each of the First Day Motions will minimize the adverse effects of the instant chapter 11 case on the Debtor and result in maximum creditor recoveries. I believe that the relief sought in each of the First Day Motions is necessary to enable the Debtor to operate effectively in chapter 11 as a debtor-in-possession.

46. Accordingly, for the reasons stated herein and in each of the First Day Motions, I respectfully request that each of the First Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Executed this 24th day of March, 2011
Princeton, New Jersey

/s/ *Walter Wojciechowski*
Walter Wojciechowski
Chief Executive Officer and President

**Exhibit A**

**LIST OF SUBSIDIARIES AND DIVISIONS**

| | | |
|---|---|---|
| MicroBilt Corporation | 22-373-7436 | DE Incorporation on 6/2/00 |
| MicroBilt Merchant Services, Inc. | 20-196-5043 | DE Incorporation on 10/18/04 |
| MicroBilt Leasing Corp. | 20-206-7096 | DE Incorporation on 12/29/04 |
| MicroBilt Assurance Corp. | 20-222-1229 | DE Incorporation on 10/18/04 |
| MicroBilt Financial Services, Corp. | 20-449-4622 | DE Incorporation on 3/31/04 |
| MicroBilt Collection Agency, Inc. | 26-225-9169 | DE Incorporation on 3/7/08 |
| Consolidated Credit Bureau, Inc. | 58-265-3038 | DE Incorporation on 10/1/01 |
| MicroBilt, SRL (Romania) | Dambovita Trade Registry No. J15/1092/25.11.2004 Sole Registration Code 16978954/25.11.2004 | Romania Incorporation on 11/25/04 |
| ComplyTraq, LLC | 20-280-4040 | DE Incorporation on 5/9/05 |
| DataFax, Inc. | 57-088-2414 (SC) 22-373-7436 (DE) | SC Incorporation on 1/6/89 MB purchased assets on 8/3/00 |
| Pay Rent, Build Credit, Inc. | 01-063-0558 (MD) | MD Incorporation on 3/12/02 |
| IDeserveCredit, LLC | 27-403-6093 | DE Incorporation on 11/23/10 |
| MicroBilt UK Limited | Company No: 06613076 | UK Incorporation on 6/6/08 |
| CL Verify, LLC | 61-144-7151 | FL Incorporation on 1/1/04 |
| CL Verify Credit Solutions, LLC | 27-064-8694 | FL Incorporation on 7/7/09 |
| CL Verify Consumer Services, LLC f/k/a CL Verify Consumer Solutions, LLC | | FL Incorporation on 7/7/09 |
| Intellidash, LLC f/k/a CL Verify Processing Solutions, LLC | | FL Incorporation on 7/7/09 |
| FIData, Inc. (a division of MB) | Merged into MicroBilt on 10/26/01 | |
| Integra Information (a division of MB) | Merged into MicroBilt on 5/31/01 | |
| MergTech (a division of MB) | MicroBilt Purchased Assets on 4/29/02 | |
| Profit Systems Software (a division of MB) | MicroBilt Purchased Assets on 7/21/05 | |
| Credit Data Systems, Inc. (a division of MB) | MicroBilt Purchased Assets on 8/12/05 | |
| Eclectic Data Systems, Inc. (a division of MB) | MicroBilt Purchased Assets on 8/12/05 | |